**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LEAH SEIDLER, and
LEAH ISRAEL, INC.

     *Plaintiff,*

  v.

JPMORGAN CHASE N.A.,

     *Defendant.*

Case No.: 23-1462

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, Leah Seidler, individually, and Leah Israel, Inc., by and through the undersigned attorneys, allege the following against JPMorgan Chase, N.A.:

## PRELIMINARY STATEMENT

1. Plaintiff, Leah Seidler, is a victim of fraud by unknown perpetrator(s).

2. Plaintiff, Leah Israel, Inc., is a business owned and operated by Leah Seidler, and is also a victim of fraud by unknown perpetrator.

3. Beginning on September 19, 2022, the Plaintiffs were victimized by a series of fraudulent texts and phone calls from a fraudster or fraudsters purporting to be representatives of the fraud department of Defendant, JPMorgan Chase, N.A. ("Defendant" or "Chase"), as part of a scam to steal funds from various accounts of the Plaintiffs with Chase.

4. The fraudsters initiated and attempted to initiate several wire transfers from the Plaintiffs' accounts with Defendant, all of which were promptly reported as unauthorized when discovered.

5. The wire transfers at issue involve three (3) of Plaintiffs' personal accounts and one (1) business account; the latter is in the name of "Leah Israel, Inc.", a New York business that the Plaintiff is the President and owner of.

6.      Posing as Chase representatives, the perpetrator(s) gained unauthorized access to the Plaintiffs' accounts and transferred by wire, on September 19, 2022, $49,000.22 from the Plaintiff's business account (Leah Israel, Inc.; Acct. ending "3817").

7.      Additionally, the perpetrator(s) made an unauthorized transaction between two personal accounts of the Plaintiff (Leah Seidler) in the amount of approximately $38,000.00 (from acct. Ending in "0953" to acct. ending "3031"), and then stole by wire transfer another $41,100.99 from one of Ms. Seidler's personal accounts (3031).

8.      The wire transaction that stole $41,100.99 from Leah Seidler's personal account was initiated on September 19, 2022, rejected three (3) times, and ultimately completed after and while the Plaintiff was reporting the unauthorized transactions in-person at the Defendant's bank on September 21, 2022.

9.      Another wire transfer in the amount of $11,000.00 was attempted and successfully cancelled on or about September 21 - September 22, 2022 from another of the Plaintiff's personal accounts.  (Acct. ending 6857).

10.     The nature of the transactions was completely out of the norm of Plaintiffs' banking history.

11.     Despite immediately disputing the unauthorized transactions, documenting the fraud directly with the Defendant and law enforcement authorities, the fact that the transactions were completely inconsistent with the Plaintiffs' account history, and Defendants' representations that the unauthorized transactions would be resolved in the Plaintiff's favor, Defendant nevertheless denied the Plaintiff's disputes.

12.     Plaintiffs brings this action against the Defendant for violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA"); New York UCC § 4-A ("NYUCC"); New

York General Business Law § 349 ("NYGBL"); Conversion; Negligence; and Negligent Hiring, Retention, Training and Supervision.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 15 U.S.C. §1693 (Electronic Funds Transfer Act).

14.     The Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 151.

15.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and JPMorgan Chase Bank, N.A. regularly does business in this District.

## PARTIES

17.     Leah Seidler ("Ms. Seidler"), is a natural person and citizen of New York, residing in New York, New York.

18.     Plaintiff is a "consumer[s]" as defined by the EFTA, 15 U.S.C. § 1693a(6).

19.     Plaintiff maintained three accounts with Chase at issue in this matter that are and/or were used primarily for personal, family, or household purposes ("3031", "0953", and "6857").

20.     Plaintiff maintained one account with Chase, in the name of Leah Israel, Inc., at issue in this matter that is and/or was used primarily for business purposes ("3817").

21.     Defendant Chase is a national banking association formed under the laws of the United States and was, at all times relevant to this Complaint, a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9), and a "creditor" as defined by 15 U.S.C. § 1602(g).

## FACTUAL ALLEGATIONSS

22.     On September 19, 2022, the Plaintiff received a text message that requested that Plaintiff verify a transaction from one of her accounts with Defendant, JPMorgan Chase, N.A., for a charge of $1000.99 to "Marriott FL".

23.     Immediately thereafter, the Plaintiff received a second text message from the same phone number that requested that Plaintiff verify a transaction from one of her accounts with Defendant, JPMorgan Chase, N.A., for a charge of $444.92 to Walmart.

24.     The text messages each requested that the Plaintiff respond "YES or NO" as to whether the transactions were authorized or unauthorized.

25.     The Plaintiff, within minutes, responded that the transactions were unauthorized, and, in response, was instructed that she would be contacted by a "fraud specialist."

26.     Contemporaneous with and subsequent to receiving and responding to the text messages concerning the unauthorized transactions on the Plaintiff's JPMorgan Chase, N.A. ("Chase" or "Defendant") account(s), Plaintiff was victimized by a fraudster or fraudsters claiming to be from Chase's fraud department.

27.     The Plaintiff, shortly after responding that the transactions were unauthorized, received a phone call from an individual purporting to be a specialist from Chase's fraud department named "Chad."

28.     The purported fraud specialist advised the Plaintiff that she was not liable for the unauthorized transactions and/or attempted transactions from her account(s) referred to previously herein.

29.     The perpetrator(s), "Chad," convincingly representing himself as Chase's fraud specialist, instructed the Plaintiff to expect a numerical code by text message, which the Plaintiff

was then required to provide to the purported Chase specialist to verify her identity.  The Plaintiff was instructed that she was required to complete the identity verification as a requirement to finalize Chase's resolution of the unauthorized transactions in her favor.

30.     The Plaintiff received the anticipated text message code from Chase's same SMS ("Short Message/Messaging Service") number that she ordinarily received account verification text message codes from.  The Plaintiff read the numerical code back to the fraudster posing as Chase's representative.  The perpetrator convincingly presented these measures as standard security and verification protocols, particularly since Ms. Seidler recognized the origination number of the on-cue SMS numerical code.

31.     The perpetrator thereafter, while on the same phone call, placed the Plaintiff on hold to purportedly speak to a "supervisor."  After returning from hold, the perpetrator assured the Plaintiff that the unauthorized transactions would not impact her account(s); and, additionally, instructed her to delete Chase's mobile application from her phone and to destroy her Chase personal and business ATM cards.

32.     The perpetrator instructed the Plaintiff to call back the following day if she wished to again verify that her account(s) had been secured.

33.     On September 20, 2022, the Plaintiff called the same number back and, after being placed on a brief hold, was again assured that her account(s) were in fact secured.

34.     The following morning, September 21, 2022, the Plaintiff received a phone call from Chase's representative asking if the Plaintiff recognized an $11,000.00 outgoing wire transfer from one of Plaintiff's accounts ("6857").

35.     The Plaintiff informed Chase's representative that the wire transfer was not recognized or authorized, and, additionally, that she'd been contacted by a different Chase

representative (the perpetrator) on September 19, 2022, concerning other unauthorized transaction(s) and/or attempted transaction(s) on her account(s).

36.     The Plaintiff, while still on the phone with Chase's representative on September 21, 2022, placed a three-way call to the perpetrator and integrated the perpetrator into the call with Chase's actual representative.

37.     Defendant's actual representative instructed the Plaintiff to visit Defendant's Branch location urgently and to not say anything further on the phone call.

38.     That same morning, September 21, 2022, the Plaintiff promptly reported to the Defendant's branch location, at which time she was informed that she was the victim of a fraud scam and told not to worry.

39.     The Plaintiff remained at the Defendant's branch until approximately 3 p.m. ensuring that the transactions were reported as unauthorized, that the transactions were in dispute, to close the compromised accounts, and to open new accounts in place of the prior accounts.

40.     The Plaintiff, prior to leaving Defendant's branch location on September 21, 2022, was instructed that Defendant would investigate and address the fraudulent transactions within 3-5 business days, that the Plaintiff's accounts were secure, and that the Plaintiff had no cause to worry and could expect the matter(s) to be resolved by the time the Plaintiff returned from the Rosh Hashana Holiday.

41.     On September 28, 2022, the Plaintiff returned to the Defendant's branch location to follow up on the matter(s) and was instructed to file a police report and complete and affidavit stating the circumstances and nature of the fraud scam that she was victimized by.

42.     On September 29, 2022, the Plaintiff followed up with the police concerning the police report, obtained the police report number, and provided the police report number and

affidavit(s) to the same Chase representative(s) that assisted her during her previous visits to the Defendant's Branch.  The Plaintiff was instructed to wait an additional 3-5 business days for the matter(s) to be resolved.

43.    On October 6, 2022, the Plaintiff visited the Defendant's branch again because the Plaintiff received letters in the interim stating that her recently opened accounts were also closed and to visit the branch for more information.  Defendant's representative at the branch location informed the Plaintiff that the letters were in error, but that she would need to re-submit the affidavit(s) and provide the full police report in lieu of the police report number.  The Plaintiff re-sent the affidavits by fax to Defendant.

44.    On October 12, the Plaintiff submitted a request online for the police report and followed up with Defendant's representative.  Defendant's representative informed the Plaintiff that the representative mistakenly reported her claims to Defendant's fraud department rather than its wire department, and that the Plaintiff was required to complete a "forgery packet"; and, the packet was required to be mailed directly to her home rather than by any other means.

45.    Defendant's branch representative acknowledged responsibility for reporting the Plaintiff's disputes to an incorrect division of Defendant's company.

46.    On October 20, 2022, the Plaintiff had not received the police report and contacted the police department by phone, was able to speak with the detective investigating her case and obtained a copy of the police report by email directly.  The Plaintiff promptly sent the police report to Defendant's representative at its branch location.  Again, the Plaintiff was instructed to wait an additional 3 – 5 days.

47.     On October 21, 2022, the Defendant's representative from the branch informed the Plaintiff that he was escalating her claims as Plaintiff was yet to receive the forgery packet that she was previously told to expect by mail.

48.     On October 22, 2022, the Plaintiff was contacted by the police for information related to the scam and events related to it.

49.     On October 24, 2022, the Plaintiff still had not received the forgery packets and Defendant's corporate representatives finally agreed to send the packets to the branch location to print and make available to the Plaintiff.  The packet requested information substantially the same as, if not identical to, the information previously provided by the Plaintiff in the affidavit(s).

50.     On October 31, 2022, the Plaintiff visited Defendant's branch with the completed forgery packets, and the branch's representative contacted a specialist representative of Defendant who again instructed the Plaintiff to wait an additional 3 – 5 days.  The branch representative acknowledged that the forgery packets were redundant with the affidavit(s) that the Plaintiff previously provided to Defendant.

51.     On November 2, 2022, the Plaintiff received a letter from Defendant inexplicably requesting yet another additional affidavit for the fraudulent transfer from her business account.

52.     On November 3, 2022, the Plaintiff attempted to address the disputed transactions with Defendant by contacting its executive office.

53.     On November 4, 2022, the Plaintiff was contacted by Defendant's executive office, was provided a case number, and was informed that the representative from the executive office would also require several additional days to investigate the status of the Plaintiff's disputed, unauthorized transactions.

54.     On November 7, 2022, despite previously providing the documents to Defendant, the Plaintiff was informed that Defendant purportedly was not in possession of the police report and affidavit(s).

55.     On November 8, 2022, the Plaintiff again provided Defendant with the affidavit(s) and the police report, which was in this instance emailed to Defendant's executive office representative.

56.     On November 11, 2022, the Plaintiff contacted Defendant's executive office representative and was, yet again, told that the matter would require several more days to be addressed.

57.     On November 15, 2022, the Defendant's executive office representative called the Plaintiff by phone and advised her that no new information was available.

58.     On November 16, 2022, the Plaintiff was informed by Defendant that her dispute(s) of the wire fraud transactions at issue was denied.

59.     On November 18, 2022, the Plaintiff contacted the Defendant's branch representative to inform him that Defendant denied her claims.  The branch representative referred the Plaintiff to Defendant's marketing manager, who resubmitted the Plaintiff's disputes to the wire fraud department.

60.     On November 22, 2022, the Plaintiff visited the Defendant's branch to report that Plaintiff discovered additional anomalies with the transactions from her accounts, including that one wire transfer appeared to take place while the Plaintiff was in Defendant's branch on September 21, 2022.  The wire appeared to occur at a point in time after the Plaintiff reported the unauthorized transactions to the Defendant's branch in-person.

61.     That same day, representative(s) from Defendant's escalation department contacted the Plaintiff and expressed shock at the details of the Plaintiff's dispute and assured her that Defendant's representative was determined to correct the issues.

62.     On November 28, 2022, Plaintiff was contacted by Defendant's escalation department again for the purpose of informing the Plaintiff that the matter would still require additional time to investigate.

63.     On November 29, 2022, the Defendant's escalation department contacted the Plaintiff to inform her that her disputes were again denied.

64.     Thereafter, the Plaintiff received a letter from Defendant dated November 20, 2022, informing the Plaintiff that only $3,429.00 and $2205.74 were being credited back to the Plaintiff's business and personal accounts, respectively.

65.     The Plaintiff contacted the escalation department on November 30, 2022 and requested to speak with a supervisor.

66.     The Defendant's escalation supervisor called the Plaintiff on December 1, 2022, and after speaking to the Plaintiff for approximately thirty (30) minutes, stated that the supervisor would reopen the claims.

67.     On December 5, 2022, the Plaintiff contacted Defendant's escalation department and was informed that the escalation department was still investigating her claims.

68.     That same day, the Plaintiff went to Defendant's branch location and was instructed that she should also submit an appeal to Defendant.  While at the branch, the Defendant's representative attempted to submit the appeal on the Plaintiff's behalf, but was informed that it wasn't possible to appeal since the matter was, in fact, reopened.

69.     Despite formally disputing the charges with supporting documentation, along with the fact that these transactions were completely inconsistent with Plaintiff' banking history, the Defendant still denied Plaintiff' dispute.

70.     To date, Defendant still has not returned the Plaintiff's funds.

71.     Plaintiff brings this action against the Defendant for violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA"); New York UCC § 4-A ("NYUCC"); New York General Business Law § 349 ("NYGBL"); Conversion; Negligence; and Negligent Hiring, Retention, Training and Supervision.

## CLAIMS FOR RELIEF

### COUNT 1:
### Violation(s) of the EFTA, 15 U.S.C. § 1693 *et seq.*

72.     Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

73.     Per the EFTA, Regulation E, and Regulation E's Official Interpretations, Chase bears the responsibility for unauthorized transfers such as the one in question from the Plaintiff's personal account in the amount of $38,000.00 ("0953" to "3031").

74.     Pursuant to 15 U.S.C. § 1693g(a), "Unauthorized electronic fund transfers; limit" states in relevant part as follows:

> In no event . . . shall a consumer's liability for an unauthorized transfer exceed the lesser of –
>
> (1) $50; or
>
> (2) the amount of money or value of property or services obtained in such, unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected.

75.     Thus, the consumer's liability for unauthorized use is generally capped at a maximum of $50 for unauthorized transfers.

76.     This cap is increased to $500 where the consumer waits more than two business days after becoming aware of the unauthorized transaction to notify the financial institution. 15 U.S.C. § 1693g(a)(2).

77.     The rules are elucidated in Regulation E, 12 C.F.R. § 1005.6(b):

(b) **Limitations on amount of liability**. A consumer's liability for an unauthorized electronic fund transfer or a series of related unauthorized transfers shall be determined as follows:

(1) Timely notice given. If the consumer notifies the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.

(2) Timely notice not given. If the consumer fails to notify the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of:

(i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and

(ii) The amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes that these transfers would not have occurred had the consumer notified the institution within that two-day period.

78.     Denials based on a consumer's alleged negligence are expressly prohibited under the EFTA's implementing regulations.  *See* Consumer Financial Protection Bureau, Comment for

1005.6 Liability of Consumer for Unauthorized Transfers, 6(b)(2) ("Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E. Thus, consumer behavior that may constitute negligence under state law, such as writing the PIN on a debit card or on a piece of paper kept with the card, does not affect the consumer's liability for unauthorized transfers.")

79.     Defendant's stated basis for denial (that Plaintiff was negligent with sensitive account information) is invalid under the EFTA.

80.     The EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

81.     Chase will not be able to meet its burden of proof regarding the contested transaction from the Plaintiff's personal account ending in 0953 to another of her personal accounts ("3031").

82.     Further, the transfer between accounts of the Plaintiff (Leah Seidler, 0953 to 3031) is not a wire transfer and is therefore not excluded from coverage under the EFTA. *See* 12 C.F.R. § 205.3(c)(3).

83.     The Plaintiff, additionally, received no benefit from the unauthorized transfer between accounts and is therefore, similarly, not excluded from the EFTA's coverage. *See* id.

84.     In fact, the subsequent wire transfer from the Plaintiff's personal account ("3031") in the amount of $41,100.99 is actually clear evidence of a detriment to the Plaintiff as that is what exposed the funds to the subsequent wire. *See Oletta Moore v. JPMorgan Chase Bank*, N.A., 2022 WL 16856105 (11/10/2022 (citing 12 C.F.R. § 205.3(c)(3)).

85.     Moreover, Chase lacks even a plausible basis for a good faith denial of Plaintiff's claim where, as here, (a) Plaintiff repeatedly contested the transaction, including with Chase itself, as well as local law enforcement; (b) the disputed transaction was completely inconsistent with Plaintiff' history and pattern of usage.

86.     Chase further violated the EFTA by failing to provide any meaningful explanation of the grounds upon which it relied in denying Plaintiff's claim. 15 U.S.C. § 1693f(d); *see* CFPB Supervisory Highlights, Issue 22, Summer 2020, Section 2.3.3 ("Financial institutions must go beyond just providing the findings to actually explain or give the reasons for or cause of those findings.").

87.     As a direct and proximate result of Chase's conduct, the Plaintiff suffered actual damages, including but not limited to past and future monetary loss, past and future mental distress, emotional anguish, and other damages that will be presented to the trier of fact.

88.     As a direct and proximate result of Chase's violation of the EFTA, Plaintiff is entitled to an award of statutory and actual damages, as well as attorney's fees and costs.

89.     Chase did not conduct a good faith investigation regarding the Stolen Funds from Plaintiff's personal account ending in 0953.

90.     Chase did not have a reasonable basis for believing the transfers from the accounts were not in error.

91.     Specifically, Chase's conduct as set forth herein constitutes a failure to investigate in good faith and a failure to establish a reasonable basis for believing that the transfer from one of Plaintiff's accounts to another personal account, proximately leading to the theft, was not in error, and also constitutes a knowing and willful conclusion that Plaintiff's account was not in error when such conclusion could not reasonably have been drawn from the available evidence,

and therefore constitutes a violation of § 1693f(e), entitling Plaintiff to treble damages in addition to all other relief sought herein.

## COUNT 2: Violations of the New York UCC § 4-A

92.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs and incorporates them with the same force and effect as if set forth specifically herein.

93.     Pursuant to New York UCC § 4-A-202(1), "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."

94.     Thus, Chase is liable for the wire transfers at issue in this case because Plaintiffs did not authorize the order and are not bound by the acts of the perpetrators under the law of agency.

95.     New York UCC § 4-A-202(2) provides an exception to the rule set forth above, but it does not apply here.

96.     New York UCC § 4-A-202(2) further provides, "[i]f a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer."

97.     The Plaintiff did not agree to or verify the wire transfers in any manner whatsoever, and, apart from the $11,000.00 attempted wire transfer from the 6857 account, was never asked to

verify any of the others prior to their transmission.  Importantly, Ms. Seidler denied making the $11,000.00, resulting in its successful cancellation before the funds were irrevocably transmitted. Had the Plaintiffs been consulted prior to transmission of the previous wires from the business and personal accounts, those transactions would have been cancelled also.

98.     Accordingly, no meaningful security protocol could be said to have been followed by the Defendant.

99.     As a result, Chase must reimburse Plaintiffs for the Stolen Funds.

100.     Furthermore, Plaintiffs were repeatedly assured that no transfer would be made without their oral confirmation, which they never gave.

101.     As set forth above, Chase failed to establish, maintain, implement, and follow commercially reasonable security procedures such that it may claim that it accepted the payment in good faith.

102.     As set forth above, Chase's failure to establish, maintain, implement, and follow commercially reasonable security procedures directly led to the theft of $90,101.21, plus bank fees from Plaintiff's Accounts, in the aggregate, by way of unauthorized wire transfers.

103.     As set forth above, Plaintiff notified Chase immediately upon discovery of the unauthorized transfers.

104.     As set forth above, Plaintiff even notified Chase, prior to or during the completion of one of the unauthorized transfers, of her concern over the security of her accounts.  Chase nevertheless failed to stop it.

105.     As set forth above, Chase failed to confirm authorization for the wire transfers.

106.    In fact, the wire transfers from one or more of the Plaintiff's accounts were rejected on multiple occasions over the course of two (2) to three (3) days before completing, and inexcusably without any attempt by Chase to verify the transactions.

107.    The wire transfers that Chase permitted without authorization involved the vast majority of the funds then existing in the Plaintiffs' accounts.

108.    Nonetheless, Chase ultimately effectuated the transfer(s).

109.    New York UCC § 4-A-204 states that "[i]f a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under Section 4-A-202, or (b) not enforceable, in whole or in part, against the customer under Section 4-A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund."

110.    Given the foregoing, Chase was required to issue a refund to Plaintiff and to pay interest on the refundable amount(s).

111.    Plaintiff immediately and repeatedly notified Chase regarding the wire transfers, yet Chase has refused to issue a refund apart from the comparatively small amounts referred to hereinabove ($3,429.00 and $2205.74).

112.    Chase failed to properly or meaningfully investigate the transactions in question, and instead held Plaintiff liable for the fraudulent wire transfers.

113.    For its failure to investigate and refund the stolen funds, Defendant has violated Article 4-A of the UCC.

## COUNT 3: Violations of the N.Y. General Business Law § 349

114. Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

115. Each of the deceptive acts and practices set forth herein constitutes a violation of NYGBL § 349, independent of whether these acts and practices constitute violations of any other law.

116. To wit and wholly apart from any other violations of law recounted in this Petition, Defendant's acts and practices on behalf of itself constitute violations of NYGBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

117. These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

118. Each of these actions was consumer-oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

119. These false and deceptive consumer-oriented actions represent an abject failure of Defendant's obligations to the actual rights and obligations of its consumer-customers.

120. Specifically, Chase engaged in deceptive conduct by:

   a. routinely denying claims based on the purported breach of a security procedure agreed to by Chase and the accountholder when it knew or should have known that no such procedure had been agreed to by the parties;

b. routinely making false statements regarding consumers' rights to reimbursement and/or consumers' rights under Chase's accountholder agreement with consumers in standardized/boilerplate communications;

c. routinely understating consumers' balances by failing to credit back fraudulent charges that are subject to reimbursement; and/or

d. routinely purporting to conduct or be in the process of conducting a bona fide investigation of unauthorized charges when, pursuant to Chase's standardized policies and procedures, no such investigation was ever conducted in good faith.

121. Defendant's misconduct resulted in Plaintiff' loss by theft of $90,101.21, plus bank fees.

122. Defendant's conduct and statements described above are materially misleading, including, but not limited to, Defendant's representations to the Plaintiff that her accounts were secure and that Plaintiff did not need to worry about the unauthorized transactions.

123. As a result of these violations of NYGBL § 349, Plaintiff have suffered and continue to suffer pecuniary and non-pecuniary harm.

124. Defendant's violations were willful and knowing and committed in bad faith.

125. For these reasons, Plaintiff is entitled to actual damages, three times the actual damages up to $1,000, punitive damages, costs and reasonable attorney's fees pursuant to NYGBL § 349(h); and declaratory judgment that Defendant's practices are deceptive as defined under § 349.

## COUNT 4: Common Law Conversion

126. Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

127. The Plaintiff had a possessory right to the funds in their accounts.

128. Under the circumstances set forth herein, certain of the Plaintiff's funds constituted personal property.

129.   Chase intentionally and without authority assumed and exercised control over Plaintiff's funds.

130.   Chase's dominion over the funds and interference with the funds — including allowing the transfer of the Stolen funds out of Plaintiff' Accounts and restraint of funds on deposit — was in derogation of Plaintiff' rights, including but not limited to Plaintiff's right to use the funds as they saw fit and have the funds returned to her.

131.   Plaintiff demanded that Chase return the funds, but it has not.

132.   As a result of Chase's actions, Plaintiff has suffered actual damages, including but not limited to the amount of the funds converted.

## **COUNT 5: Negligence**

133.   Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

134.   By undertaking to verify the identity of the putative Chase representative who was in fact a fraudster and by informing Plaintiff that no funds would be released, Chase voluntarily assumed duties to Plaintiff.

135.   By releasing the funds without receiving verbal confirmation, or any confirmation whatsoever, Chase failed to exercise reasonable care and failed to act carefully with respect to the duties it voluntarily assumed.

136.   Chase's conduct placed Plaintiff in a more vulnerable position than had Chase done nothing, *i.e.* had Chase not assured the Plaintiff that her accounts were secure.

137.   Indeed, these failures to act reasonably and carefully with regard to duties voluntarily assumed resulted in all of Plaintiff' losses.

138.    As a direct and proximate result of Chase's conduct, Plaintiff has suffered actual damages, including but not limited to past and future monetary loss, past and future emotional distress and anguish, and other damages that will be presented to the trier of fact.

**COUNT 6:**
**Negligent Hiring, Retention, Training, And Supervision**

139.     Plaintiff repeats and realleges the allegations contained in the above paragraphs and incorporate them with the same force and effect as if set forth specifically herein.

140.    Chase failed to exercise reasonable care in selecting, instructing and supervising the employees and/or agents it hired to support their customers' fraud claims.

141.    Chase did not properly train or supervise the employees and/or agents who support their customers' fraud claims.

142.    Chase owed a duty of care to the Plaintiff such that its employees and agents would act in accordance with state and federal laws.

143.    As a direct result and proximate cause of Chase's employees and/or agents' unreasonable, negligent, unfair, illegal and/or fraudulent conduct, Plaintiff has suffered harm including, without limitation, the damages set forth above.

144.    As a result of the foregoing, Plaintiff has suffered actual damages, including but not limited to past and future monetary loss, past and future emotional distress and anguish, and other damages that will be presented to the trier of fact.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff seek judgment in their favor and damages against the Defendant:

A.    awarding Plaintiff actual damages, statutory damages, punitive damages, costs, and reasonable attorneys' fees; and

    B.    such other and further relief, including equitable relief, as may be necessary, just, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: February 22, 2023

*/s/ Daniel A. Schlanger*
Daniel A. Schlanger
Schlanger Law Group LLP
80 Broad Street, Suite 1301
New York, NY 10004
T: 212-500-6114
F: 646-612-7996
E: dschlanger@consumerprotection.net

*Counsel for Plaintiff*
