**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

LEAH SEIDLER and LEAH ISRAEL, INC.,

                                       Plaintiffs,

                         -against-

JPMORGAN CHASE BANK, N.A.,

                                       Defendant.

----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___ 1/12/2024 __

**23-CV-01462 (GHW) (VF)**

**REPORT AND RECOMMENDATION**

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE GREGORY H. WOODS, United States District Judge.**

       Plaintiffs, Leah Seidler and Leah Israel, Inc., a business owned and operated by Seidler, were victimized by a series of fraudulent text messages and phone calls, resulting in the perpetrators of the fraud gaining unauthorized access to Plaintiffs' bank accounts at Defendant JPMorgan Chase Bank, N.A. ("Chase") and obtaining funds from those accounts. On February 22, 2023, Plaintiffs commenced this action against Chase, alleging violations of the Electronic Fund Transfer Act 15 U.S.C. § 1693, the New York UCC § 4-A-202, and the New York General Business Law ("GBL") § 349, and asserting claims for conversion, negligence, and negligent hiring, retention, training and supervision. See ECF Nos. 1 ("Compl."), 6 ("Am. Compl."). On June 14, 2023, Chase filed a motion to dismiss Plaintiffs' GBL § 349 claim, conversion claim, and claims for negligence and negligent hiring, retention, and training. See ECF No. 19. For the reasons that follow, I respectfully recommend that Chase's motion to dismiss Counts III, IV, V, and VI in the amended complaint be **GRANTED**.

**BACKGROUND**

A. **Factual Background**[1]

Seidler is the owner of the business Leah Israel, Inc. See Am. Compl. ¶ 2. Seidler has three bank accounts at Chase, which are used for personal purposes, and one bank account at Chase used by Leah Israel, Inc. Id. ¶¶ 19-20. On September 19, 2022, Seidler received a text message that requested she verify a transaction from one of her accounts at Chase for a charge of $1,000.99 to "Marriott FL." Id. ¶¶ 22. She immediately received a second text message from the same phone number that requested she verify a transaction from one of her accounts at Chase for a charge of $444.92 to Walmart. Id. ¶ 23. Seidler responded that the transactions were unauthorized and was instructed that she would be contacted by a "fraud specialist." Id. ¶ 25. Shortly thereafter, Seidler received a phone call from an individual purporting to be a specialist from Chase's fraud department. Id. ¶ 27. The individual identified himself as "Chad." Id.

Chad told Seidler that "she was not liable for the unauthorized transactions." Id. ¶ 28. Chad instructed Seidler to expect a text message with a numerical code, which Seidler would then give Chad to "verify her identity" as the account holder. Id. ¶ 29. Chad told Seidler that she was required to complete the identity verification as a requirement to finalize the bank's resolution of the unauthorized transactions. Id.

Seidler received the text message containing the numerical code, and the text was sent from Chase's "SMS ('Short Message/Messaging Service') Number that [Seidler] ordinarily received account verification text messages from." Id. ¶ 30. Seidler gave Chad the numerical

---

[1] The factual allegations recounted herein are taken from the Amended Complaint. See ECF No. 6. For purposes of considering Chase's motion to dismiss, I accept as true all well-pled factual allegations in Plaintiffs' Amended Complaint and draw all reasonable inferences in Plaintiffs' favor. ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

2

code. Id. Chad then placed Seidler on hold to "speak to a supervisor" and after the hold, Chad assured Seidler that the unauthorized transactions "would not impact her account(s)." Id. ¶ 31. Chad also instructed Seidler to delete the bank's mobile application from her phone and destroy her personal and business ATM cards. Id. Finally, Chad told Seidler that she could call back the next day to verify that her bank accounts had been secured. Id. ¶ 32.

That same day, September 19, an unauthorized wire transfer in the amount of $41,100.99 was made from one of Seidler's personal accounts at Chase.[2] Id. ¶¶ 7-8. Also that same day, an unauthorized wire transfer in the amount of $49,000.22 was made from Seidler's business account. Id. ¶ 6.

On September 20, 2022, Seidler called back the same number where she had spoken to Chad and was assured that her bank accounts were secured. Id. ¶ 33. The next day, on September 21, 2022, Seidler received a phone call from a Chase representative, asking if she recognized an $11,000 outgoing wire transfer from one of her bank accounts. Id. ¶ 34. Seidler told the representative that the wire transfer was not authorized. Id. ¶ 35. She also explained that she had been contacted by a different Chase representative on September 19, concerning other unauthorized transactions on her accounts. Id. The representative from Chase instructed Seidler to visit a branch location "urgently." Id. ¶ 37. That same morning, September 21, Seidler visited a branch location and was told that she had been "the victim of a fraud scam and told not to worry." Id. ¶¶ 38-39. Prior to leaving the branch location on September 21, Seidler was told that

---

[2] Before the $41,100.99 could be withdrawn from Seidler's account, the perpetrators of the fraud caused an unauthorized wire transfer in the amount of $38,000 from one of Seidler's personal accounts to the account from which the $41,100.99 was withdrawn. Am. Compl. ¶ 7. The unauthorized wire transfer for $41,100.99 was rejected three times before it was ultimately completed on September 21, 2022, "at a point in time after [Seidler] reported the unauthorized transactions" to Chase. Id. ¶¶ 8, 60.

the bank would "investigate and address the fraudulent transactions within 3-5 business days." Id. ¶ 40. Seidler was also told that her accounts were "secure" and that she had "no cause to worry." Id.

On September 28, 2022, Seidler returned to the bank branch to follow up and was instructed to file a police report and complete an affidavit stating the circumstances of the fraud. Id. ¶ 41. On September 29, 2022, Seidler obtained the police report number and gave it to a Chase representative, along with her affidavit. Id. ¶ 42. Seidler was told to wait an additional 3-5 business days "for the matter to be resolved." Id.

On October 6, 2022, Seidler returned to a Chase branch and a representative told her that she needed to re-submit the affidavit and provide a full police report. Id. ¶ 43. On October 12, Seidler followed up with a representative at the bank. The Chase representative told Seidler that they had "mistakenly reported her claims to [the bank's] fraud department rather than its wire department." Id. ¶¶ 44-45. Seidler was also informed that she had to complete a "forgery packet." Id.

On October 20, 2022, Seidler sent the police report to a representative of Chase and was again instructed to wait 3-5 days. Id. ¶ 46. On October 21, a representative from the bank informed Seidler that "he was escalating her claims" because Seidler had yet to receive the forgery packet that she was told to expect in the mail. Id. ¶ 47.

On October 31, 2022, Seidler provided the completed forgery packet to Chase. Id. ¶ 50. The information requested in the forgery packet was "substantially the same as, if not identical to," the information Seidler had previously included in her affidavit. Id. ¶¶ 49-50.

On November 2, 2022, Seidler received a letter from Chase requesting another affidavit. Id. ¶ 51. On November 3, 2022, Seidler contacted Chase's "executive office." Id. ¶ 52. On

4

November 4, 2022, the executive office contacted Seidler. Id. ¶ 53. Seidler was given "a case number" and was told by the representative that the bank needed "additional days to investigate the status" of the unauthorized wire transfers. Id.

On November 16, 2022, Chase informed Seidler that her dispute of the wire transfers was denied. Id. ¶ 58. On November 18, Seidler contacted a branch representative who referred Seidler to a marketing manager who "resubmitted [Seidler's] disputes to the wire fraud department." Id. ¶ 59.

On November 29, 2022, the "escalation department" at Chase contacted Seidler to inform her that "her disputes were again denied." Id. ¶ 63. Seidler received a letter from Chase, dated November 20, 2022, informing her that $3,429 would be returned to her business account and $2,205.74 would be returned to her personal account. Id. ¶ 64. To date, Chase "still has not returned" the disputed wire transfers. Id. ¶ 70.

## B. Procedural Background

Plaintiffs commenced this action on February 22, 2023. See ECF No. 1. On March 2, 2023, Plaintiffs filed an Amended Complaint asserting five counts against Chase. ECF No. 6. Plaintiffs' Amended Complaint alleged that Chase's conduct violated the Electronic Fund Transfer Act ("EFTA") 15 U.S.C. § 1693, New York UCC § 4-A, and New York's GBL § 349. Am. Compl. ¶¶ 72-125. Plaintiffs also assert state-law claims for conversion, negligence, and negligent hiring, retention, training and supervision. Id. ¶¶ 126-44.

On June 14, 2023, Chase filed a motion to dismiss three claims: the GBL § 349 claim in Count III, the conversion claim in Count IV, the negligence claim in Count V, and the negligent hiring, retention, training, and supervision claim in Count VI. ECF No. 20 ("Def.'s Br."). Plaintiffs filed their opposition on August 15, 2023. ECF No. 23 ("Pls.' Br."). In their brief,

5

Plaintiffs withdrew their claims for negligence and negligent hiring, retention, training and supervision. Pls.' Br. at 2 n.1. On September 6, 2023, Chase filed its reply brief. ECF No. 24.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'" Green v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). In determining if a claim is sufficiently plausible to withstand dismissal, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322, 324 (2007). However, a court does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678. The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

## DISCUSSION

### A. General Business Law § 349 Claim

Section 349 of New York's General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GBL § 349(a). A claim under GBL § 349 requires a plaintiff to allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3)

the plaintiff has been injured as a result."' Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)). A deceptive act is one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." Id. (quoting Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 26 (1995)). A claim under § 349 need not meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Duran v. Henkel of Am., Inc., 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020).

GBL § 349 "is directed at wrongs against the consuming public." Oswego Laborers, 85 N.Y.2d at 24. Although the conduct does not need to be "recurring," it must be "consumer-oriented." Id. at 25. Consumer-oriented conduct for a GBL § 349 claim is activity that causes any "consumer injury or harm to the public interest." Anderson v. Unilever United States, Inc., 607 F. Supp. 3d 441, 451 (S.D.N.Y. 2022) (quoting New York v. Feldman, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2022)). This requirement can be satisfied with a showing that the conduct at issue "'potentially affect[s] similarly situated consumers.'" Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010)) (quoting Oswego Laborers, 623 N.Y.S. 2d at 533); see also Sheth v. N.Y. Life Ins. Co., 273 A.D.2d 72, 73 (1st Dep't 2000) (explaining that consumer-oriented element of § 349 claim may be met with "showing that the practice has a broader impact on the consumer at large") (citations omitted). Liability under the statute attaches "primarily where a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers." Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc., 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004).

Consequently, private contractual disputes, "unique to the parties," do not give rise to a violation of GBL § 349. Id. at 447; see also Schlessinger v. Valspar Corp., 21 N.Y.3d 166, 172 (2013) (noting that GBL § 349 "does not grant a private remedy for every improper or illegal

business practice"); MaGee v. Paul Revere Life Ins. Co., 954 F. Supp. 582, 586 (E.D.N.Y. 1997) ( "[T]he injury must be to the public generally as distinguished from the plaintiff alone."); Teller v. Bill Hayes, Ltd., 213 A.D.2d 141, 145 (2d Dep't 1995) ("[T]he deceptive act or practice may not be limited to just the parties."). Stated otherwise, there is no claim under § 349 where the private transaction does not have "ramifications for the public at large." Canario v. Gunn, 300 A.D.2d 332, 333 (2d Dep't 2002) (affirming dismissal of § 349 claim where "misrepresentation had the potential to affect only a single real estate transaction involving a single unique piece of property," and where the "only parties truly affected by the alleged misrepresentation" were the parties). "Where a plaintiff makes only conclusory allegations of impact on consumers at large, a GBL § 349 claim must be dismissed." Miller v. HSBC Bank U.S.A., N.A., No. 13-CV-7500, 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015).

Chase seeks dismissal of Plaintiffs' GBL § 349 claim on three grounds. First, Chase contends that the amended complaint does not allege that Chase engaged in "consumer-oriented conduct." Def.'s Br. at 5-6. Second, Chase argues that Plaintiffs have not alleged "materially misleading" conduct by Chase. Id. at 6-7. And third, Chase avers that Plaintiffs have not alleged an injury as a result of conduct by Chase. Id. at 7. All three grounds support dismissal of Plaintiffs' GBL § 349 claim.

First, the amended complaint does not plausibly allege the existence of consumer-oriented conduct by Chase, as required under GBL § 349. In claiming that they have alleged consumer-oriented conduct, Plaintiffs point to the allegations in the amended complaint concerning Chase's "policy and practice of permitting electronic funds transfers . . . without disclosing or obtaining customers' agreement to any security procedures and/or approving transfers and thereafter denying disputes based on the purported breach of security procedures by

the consumer." Pls.' Br. at 7-8 (citing Am. Compl. ¶¶ 96-97, 101-08, 120). Plaintiffs allege that Chase "routinely" makes "false statements regarding consumers' rights to reimbursement" and "routinely" denies "claims based on the purported breach of a security procedure." Am. Compl. ¶ 120. But Plaintiffs have not provided any factual allegations to plausibly suggest the existence of a policy and practice by Chase of "routinely" denying claims of fraud, or a policy or practice of permitting fraudulent wire transfers from customer accounts. Instead, the factual allegations here are specific to Plaintiffs' bank accounts and unique to Plaintiffs themselves.

To begin, all of the factual allegations concern specific fraudulent wire transfers from Plaintiffs' own accounts. See 123RF LLC v. HSBC Bank USA, N.A., No. 21-CV-8519 (NRB), 2023 WL 2611632, at *9 (S.D.N.Y. Mar. 23, 2023) (plaintiff failed to state § 349 claim, in part, because allegations concerned specific debits from plaintiff's account, that plaintiff claimed were unauthorized, and only allegation that "connect[ed] plaintiff's claim to the public" were conclusory statements that "other members of the public . . . were subject to these deceptive acts"); Silverman v. Household Fin. Realty Corp. of N.Y., 979 F. Supp. 2d 313, 318 (E.D.N.Y. 2013) (dismissing § 349 claim where claim was premised on "particular circumstances" of plaintiffs' home mortgage loan with defendant and whether advice given by defendant during loan modification application was misleading); Ogbon v. Beneficial Credit Servs., Inc., No. 10-CV-3760 (GBD), 2011 WL 347222, at *1, *4 (S.D.N.Y. Feb. 1, 2011) (dismissing § 349 claim alleging that defendants opened an account for plaintiff without authorization and reported false data about the account, because plaintiff had no specific factual allegations demonstrating that defendants conduct was recurring or had an impact on consumers at large).

Plaintiffs have included no allegations concerning any conduct by Chase that involves consumers at large. And although Plaintiffs allege that the purported "deceptive conduct" by

Chase is routine and consumer-oriented, Am. Compl. ¶¶ 118, 120, those allegations are conclusory and unsupported by factual detail to plausibly suggest the existence of a routine policy or practice that affects the consuming public. See 123RF LLC, 2023 WL 2611632, at *9 (conclusory statements that conduct by defendant was consumer-oriented are insufficient to survive dismissal). There are no allegations detailing specific conduct by Chase directed at other bank customers. Nor are there any factual allegations substantiating the existence of a purported policy or practice implemented by Chase. And although Plaintiff alleges that the policies and procedures are "standardized," this allegation too is conclusory and unsupported by factual details explaining the nature of the policy or practice and how the bank applies it to other customers. Am. Compl. ¶ 120(d).

Plaintiffs argue that the statements made by Chase representatives to Seidler, "assuring her that her account was protected," are "applicable to any similarly situated customer of the bank." Pls.'s Br. at 8. But this is pure conjecture unsupported by factual allegations. First, there are no allegations in the amended complaint suggesting that the same representation made to Seidler was made to other customers experiencing similar fraudulent wire transfers. As alleged in the amended complaint, Seidler had verbal communications with bank representatives on various occasions. See Am. Compl. ¶¶ 34-35, 38, 40-41, 43, 50, 57, 60, 66, 68. These were private, one-on-one interactions between individuals. There are no factual allegations plausibly suggesting that these communications were based on a script or boilerplate template, such that it could be inferred that a bank representative would make the same statement to another customer in a similar position to Seidler. To be sure, Plaintiffs make a threadbare allegation that the "false statements" were "standardized/boilerplate communications," Am. Compl. ¶ 120(b), but Plaintiffs provide no factual support to substantiate that allegation. Instead, as alleged, these were

10

one-on-one conversations between Seidler and employees of Chase and there are no factual allegations to plausibly suggest that the same statements made to Seidler were, or would be, made to other bank customers experiencing similar fraudulent wire transfers. See Green v. Capital One, N.A., 557 F. Supp. 3d 441, 454-55 (S.D.N.Y. 2021) (concluding that plaintiff had not alleged consumer-oriented conduct where claim was premised on allegation that unauthorized transactions from bank account were not investigated by bank in good faith); Ripka v. Safeco Ins., No. 14-CV-1442, 2015 WL 3397961, at * 3 (E.D.N.Y. May 26, 2015) ("[A] defendant cannot be held liable pursuant to § 349 where the disputed private transaction does not have ramifications for the public at large.") (citation and internal quotation marks omitted). In short, Plaintiffs allegations do not plausibly suggest consumer-oriented conduct by Chase.

Moreover, Plaintiffs have not plausibly alleged that Chase engaged in "materially misleading" conduct, another element of a GBL § 349 claim. The amended complaint alleges the following deceptive conduct by Chase: "routinely denying claims based on the purported breach of a security procedure . . . when [Chase] knew or should have known that no such procedure had been agreed to by the parties"; "routinely making false statements regarding consumers' rights to reimbursement . . . in standardized/boilerplate communications"; "routinely understating consumers' balances by failing to credit back fraudulent charges"; "routinely purporting to conduct . . . bona fide investigations of unauthorized charges . . . [when] no such investigation was ever conducted in good faith"; and Chase's representations to Seidler that "her accounts were secure" and that she "did not need to worry about the unauthorized transactions." Am. Compl. ¶¶ 120, 122.

To the extent Plaintiffs are challenging the adequacy of Chase's security procedures, the allegations in the amended complaint make clear that security procedures were in place, and it

11

was Seidler's conduct that led to the breach. As the amended complaint alleges, Seidler received a numerical code via text message from Chase's "SMS" number—the same number from which "she ordinarily received account verification message codes" from Chase—and Seidler gave that code to the person impersonating a Chase representative. Am. Compl. ¶¶ 26, 29-30. It was thus Seidler who circumvented Chase's security measures by providing the authentication code to the fraudster. None of Plaintiffs allegations, however, suggest any misleading conduct by Chase as it pertains to the security measures on Plaintiffs' accounts.

Next, as it relates to Plaintiffs' complaints about Chase's investigation of the unauthorized wire transfers, Plaintiff has proffered no factual allegations to support her conclusory assertion that Chase's investigation was not performed in good faith. The amended complaint alleges that Seidler was told on various occasions that the wire transfers were being investigated by Chase. Am. Compl. ¶¶ 39-40, 42, 47, 50, 53, 56, 59, 61-62. The amended complaint further alleges that Plaintiffs' dispute concerning the wire fraud transactions was "denied." Id. ¶¶ 58, 63. There are no allegations, however, to support a plausible inference that Chase did not conduct a bona fide investigation, as it had represented it would do. Although Plaintiffs are unhappy with the outcome of the investigation, that does not suggest that the investigation was not performed in good faith. See Green, 557 F. Supp. 3d at 455-56 (reasoning that plaintiff had not alleged that bank engaged in conduct likely to mislead reasonable consumer where allegations were that bank conducted inadequate investigation into fraudulent transactions in account).

Lastly, Plaintiffs have not alleged any injury caused by Chase's purportedly deceptive conduct or misrepresentations. Under GBL § 349, a plaintiff must allege an "injury as the result of the allegedly deceptive act or practice." Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940,

12

941 (2012); <u>Nealy v. U.S. Surgical Corp.</u>, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (explaining that a plaintiff must "show that the defendant's material deceptive act caused the injury") (internal quotation marks omitted). Plaintiffs' alleged injury is the loss of $90,101.21 due to the fraudulent wire transfers. <u>See</u> Am. Compl. ¶¶ 6-8, 101-02. But those wire transfers occurred prior to the alleged false statement by Chase. <u>See</u> <u>id.</u> ¶¶ 6-7. And to the extent one wire transfer may have been "completed" on September 21, while Plaintiff was at the Chase branch reporting the fraud (<u>see</u> <u>id.</u> ¶ 8), the allegations indicate that the wire transfer was "initiated" before Chase's involvement, and, in any case, there are no factual allegations tying any deceptive conduct by Chase on that date to the consummation of the wire transfer. Simply stated, there are no allegations connecting any alleged misrepresentation by Chase to the loss of the money in Plaintiffs' accounts. <u>Cf.</u> <u>Goldemberg v. Johnson & Johnson Consumer Co. Inc.</u>, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) (concluding that plaintiff had adequately alleged causation where complaint explained that plaintiff saw misleading product labels and was "deceived into purchasing the products"); <u>Lin v. Canada Goose US, Inc.</u>, 640 F. Supp. 3d 349, 360 (S.D.N.Y. 2022) (dismissing § 349 claim where plaintiff had not alleged that she saw the misrepresentations by defendant prior to her purchase and therefore made the purchase "as a result of" the misrepresentations).

In sum, I recommend that Plaintiffs' GBL § 349 claim be dismissed.

## B. Conversion Claim

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." <u>Colavito v. N.Y. Organ Donor Network, Inc.</u>, 8 N.Y.3d 43, 49-50 (2006). A claim for conversion under New York law requires a plaintiff to allege that it has (1) a

13

"possessory right or interest in the property" and that (2) defendant had "dominion over the property or interference with it, in derogation of plaintiff's rights.'" Id. at 50 (internal citations omitted); see also Acevado v. Citibank, N.A., No. 10-CV-8030 (PGG), 2012 WL 996902, at *11 (S.D.N.Y. Mar. 23, 2012).

"A claim for conversion does not lie with respect to moneys deposited with a bank." AJ Energy LLC v. Woori Bank, No. 18-CV-3735 (JMF), 2019 WL 4688629, at *6 (S.D.N.Y. Sept. 26, 2019); see also Acevado, 2012 WL 996902, at *11-12 (collecting cases). This is because in a conversion action a plaintiff must "demonstrate that the property in question is a specific, identifiable thing," and a checking account "which does no more than create a debtor-creditor relationship, does not satisfy that requirement." Acevado, 2012 WL 996902, at *11 (internal citations and quotation marks omitted). "[F]unds deposited with a bank become an asset of the bank, and the bank, in turn, becomes indebted to the depositor." Newbro v. Freed, 409 F. Supp. 2d 386, 395-96 (S.D.N.Y.2006) (citing Feinberg v. Katz, No. 99-CV-45(CSH), 2002 WL 1751135, at *16-17 (S.D.N.Y. July 26, 2002)). As such, the funds "cannot be converted." Acevado, 2012 WL 996902, at *11; see also Fundacion Museo de Arte Contemporaneo de Caracas v. CBI–TDB Union Bancaire Privee, 160 F.3d 146, 148 (2d Cir. 1998) (explaining that the "funds deposited in a bank account are not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim for conversion against the bank") (internal quotation marks omitted).

Here, once Seidler deposited her funds into the four Chase bank accounts, the funds became an asset of the bank. Newbro, 409 F. Supp. 2d at 395. And "funds deposited in a general bank account are not sufficiently identifiable to support a claim for conversion." Acevado, 2012 WL 996902, at *12. Plaintiffs acknowledge as much, but nonetheless argue that a conversion

14

claim lies because Chase engaged in "additional culpable conduct" that caused the loss of the funds. Pls.' Br. at 12-13. Plaintiffs specifically point to the $38,000 that was transferred between two of Seidler's personal accounts, arguing that the $38,000 are specific, identifiable funds. Id. at 13; see also Am. Compl. ¶ 7.

Contrary to Plaintiffs' argument, the $38,000 are not specific, identifiable funds for a conversion claim. To be specifically, identifiable funds, "courts have considered whether the money was segregated, the number of transfers involved (or the degree of separation from the plaintiff seeking recovery), and whether the defendant from which recovery was sought was implicated in the bad acts alleged." Schottenstein v. Lee, No. 22-CV-1197 (DLC), 2023 WL 4363002, at *3 (quoting Fam. Health Mgmt., LLC v. Rohan Devs., LLC, 171 N.Y.S.3d 44, 49-50 (1st Dep't 2022) (internal quotation marks omitted)). Here, there are no allegations that the $38,000 was ever segregated, either when it was in Seidler's personal account or after its transfer to another of her accounts. Id. at *11 (dismissing conversion claim where $111,000, "a portion" of the full amount stolen from plaintiffs' bank accounts, was not "specifically identifiable fund" where there were "no allegation that the $111,000 was ever segregated in the accounts through which it moved").

Accordingly, I recommend that Plaintiffs' conversion claim also be dismissed.

## CONCLUSION

For the reasons set forth above, I recommend that Defendants' motion to dismiss be

**GRANTED** as to Counts III and IV in the amended complaint. Additionally, because Plaintiffs

withdrew their claims in Counts V and VI of the amended complaint, I recommend that those

claims also be dismissed.

**SO ORDERED.**

DATED:    New York, New York
          January 12, 2024

_____
VALERIE FIGUEREDO
United States Magistrate Judge

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Gregory H. Woods. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**